BRENNAN, J.
¶1 A jury convicted Dedric Earl Hamilton, Jr., of first-degree sexual assault of a child under the age of thirteen and incest with a child. The victim was Hamilton's eight-year-old niece, D. He appeals the judgment of conviction and an order that denied his motion for postconviction relief without a hearing.[1] On appeal, he argues that his postconviction motion contained sufficient factual allegations to entitle him to an evidentiary hearing on his claim that trial counsel was constitutionally ineffective. He also argues that he is entitled to a new trial in the interest of justice.
¶2 His postconviction motion made three arguments for a new trial based on three failures he alleged were both deficient performance and prejudicial. Each related to counsel's failure to exclude or rebut the statement he made to police that he had, in a non-sexual manner, "patted [D.'s] butt" and "tapped" her vaginal area over her clothing one time in the middle of the day, with his mother and brother both nearby. First, he argued that counsel failed to assert that his Miranda waiver[2] was invalid because the officer gave the Miranda warning "very rapidly," reading the warning "as one run-on sentence in just 21 seconds" and as a result Hamilton did not "in fact, fully understand his rights[.]" Second, he argued that counsel failed to assert that his statement to police was inadmissible because it was involuntary within the meaning of State v. Jerrell C.J. , 2005 WI 105, 283 Wis. 2d 145, 699 N.W.2d 110, because he has characteristics of "extreme suggestibility and compliance" and the specific police tactics used-such as telling him that inculpatory DNA evidence existed-"exceeded [his] ability to resist." Third, he argued that trial counsel failed to present expert testimony to the jury "explaining [his] weaknesses and how police interrogation techniques exploit those weaknesses, leading to confessions of questionable reliability."
¶3 We do not address whether any of these alleged failures constituted deficient performance because we resolve this case solely on prejudice grounds. Hamilton is not entitled to an evidentiary hearing on his motion because, even if trial counsel's representation was deficient as he has claimed, he has failed to show that there is a reasonable probability-"a probability sufficient to undermine confidence in the outcome"-that "the result of the proceeding would have been different" but for the alleged deficiencies of trial counsel. See Strickland v. Washington , 466 U.S. 668, 694 (1984). The evidence presented at trial included strong, consistent testimony from the victim-both on video and in person, subject to cross-examination-along with corroborating physical evidence of internal abrasions on the child's genitals. The jury also heard testimony from three adults who heard the victim's account within hours or days of the assault, and each account contained the same details: that Hamilton woke her while everyone was sleeping, asked for a hug, pulled down her pants, put his hand in her vagina in a way that hurt, and touched her vagina with his penis. There is no reasonable probability that the outcome of the trial would have been different if trial counsel had succeeded in suppressing Hamilton's statement or had presented expert testimony on interrogation tactics in an effort to persuade jurors that it might be untrue and coerced. In short, we conclude that Hamilton was not deprived of a fair trial because "the error complained of did not contribute to the verdict obtained." See State v. Jenkins , 2014 WI 59, ¶37, 355 Wis. 2d 180, 848 N.W.2d 786.
¶4 We also conclude that the real controversy was fully tried because the victim, the investigating officer, the sexual assault nurse, and the detective who interviewed Hamilton all testified and were subject to vigorous cross-examination. We therefore determine that there is no basis for granting a new trial in the interest of justice.
BACKGROUND
The June 25, 2012 incident and the report to police the next day.
¶5 The following facts are taken from trial testimony. The crimes Hamilton was charged with occurred on the night of June 25, 2012, when Hamilton's eight-year-old niece, D., was sleeping over at the home of her grandmother. The next day D. returned home, and about fifteen minutes after she arrived, when her siblings were upstairs to prepare for bed, she asked her mother if she could tell her something. D. referred to Hamilton as "Uncle DB." Her mother testified at trial that D. said, "[W]ell, when I was over at my grandma house this weekend ... Uncle DB came into the living room, and he woke me up[.]" D.'s mother testified that D. started crying at that point and had to be encouraged to continue to talk. D.'s mother testified as follows:
[S]he said ... ["]when he woke me up out of my sleep, he walked me over to the couch, and he said to me I'm your favorite uncle, ain't I["], and she nodded her head yes; and then he said - no, he didn't say nothing after that. He pulled her pants down.
¶6 D.'s mother said she became upset and asked D. to wait to complete the story until a friend could come to hear it. Within ten minutes of that conversation, D.'s mother called her friend, her sister, and the police. On cross-examination, D.'s mother was asked why she felt more comfortable having D. talk about the assault to her friend instead of her. She answered, "It wasn't that I felt 'more comfortable.' It was just that I knew that somebody close needed to hear everything. And at that time-moment-I wasn't able to hear everything."
¶7 The sensitive crimes officer who responded to the call at approximately 9:00 p.m. testified that she asked D. if she understood why the police were there, and D. responded that it was because her uncle "had put his you know what between her legs[.]" The sensitive crimes officer scheduled a forensic interview for two days later.
¶8 Just after midnight that night, D. was admitted at the emergency room, and a sexual assault nurse who was on call arrived to conduct an examination. The nurse testified at trial that she spoke briefly in private with D. before examining her and did not ask many questions because a forensic interview was already scheduled. D. told the nurse that Hamilton had come into the room where she was sleeping, given her a hug, pulled her back to him, put "his thing" between her legs, and pulled down her panties and started "digging around" in her genitals with his fingers. D. told the nurse that Hamilton repeatedly told her to "be a good girl" and kissed her and was "grabbing [her] butt." At the time of the exam, the nurse observed that the internal vaginal tissue of the labia minora, not the surface area of the vaginal area, was abnormally "red and tender throughout" and that there was an abrasion. The nurse testified that "[t]he only pain [D.] complained of was genital pain." The nurse testified that there was no evidence of poor hygiene or infection, and that the abrasion was consistent with D.'s account: "[T]he digging around and fingers, abrasions are consistent with fingernail injuries."
¶9 The jury also saw the videotape of the June 28 forensic interview in which D. said that she had been sleeping on the living room floor and Hamilton had awakened her, told her to give him a hug, then pulled her close to him and put his penis between her legs, pulled down her leggings and underwear, and started digging his fingers into her genitals, and she said this "hurt bad." She told the interviewer that he picked her up and started kissing her, then started to carry her to his bedroom. She said she pushed him away and went back to the living room. The officer described the way D. used dolls in the interview to illustrate what had happened:
There were two different instances where she showed me that there was touching going on. The one was where they were face to face ... where the male doll's arms are going around the back of the female doll and touching her butt.
The other one where they're still facing each other, but the male's hand was in the front of the female's where it would be her vaginal area.
¶10 D. also testified at trial. She testified on cross-examination that on June 25, she had been at her grandmother's house, sleeping on the floor with her younger brother, and that the other members of the household, including Hamilton, had been sleeping in the bedrooms. She testified as follows about the initial contact:
I was sleeping on the floor with my brother. And then [Hamilton] woke me up, and I had went to go give him a hug.... So I went to go give him a hug, and I tried to go back, lie back down; but he wouldn't let me.
¶11 On direct examination, D. ultimately testified that Hamilton "pulled [her] pants down," that he put "his hand down there and start touching it," and that when he "asked [her] did it hurt," she said yes. She testified that he touched her "private part" with "his private part." She testified that she told Hamilton to stop, and "he told [her] to shh-he told [her] to be quiet." She said she "was crying a little[,] [a]nd then he felt my heart beating, and he asked me what was wrong. And I said I want my mama and I'm scared.... And he pulled my pants down, and he was touching my private part."
¶12 She also testified that Hamilton had never seen her private parts. When trial counsel told D. she was "not making sense" and asked D. to explain the discrepancy in her testimony about private parts, D. answered, "He's never seen it, but he touched it."
Hamilton's interrogation and statement to police.
¶13 On June 27, 2012, Detective Steve Wells interviewed Hamilton about the allegations for just over an hour. The interview was videotaped. The jury saw only those portions of the videotaped interview to which the parties stipulated. The jury saw the portions of the interview at issue-Hamilton's Miranda waiver and Hamilton's statement to Wells about "patting" D.'s butt and "tapping" D.'s vaginal area over her clothes.
¶14 Prior to the interrogation, the following exchange took place between Wells and Hamilton:
Wells: Um, Mr. Dedric, before I talk to you about why you're here you know I got to read you your rights because, uh, you're in custody and I have to go through what is called a pedigree.
Defendant: mm-hmm [nodding head yes]
Wells: Have you ever had your rights read before?
Defendant: mm-hmm
Wells: I'm sorry?
Defendant: Yes.
Wells: When they were read to you did you understand them?
Defendant: Yes.
Wells: Okay. If you have any questions you can always, you know, ask me.
¶15 At that point Wells read Hamilton his Miranda rights. Wells asked Hamilton if he understood the rights and Hamilton responded, "Yes sir." Hamilton then said he was willing to talk to Wells. There is no indication in the record that Hamilton asked any questions related to the Miranda warning.
¶16 Wells testified at trial about the interrogation. He testified that he had no DNA reports in connection with the crime but that he told Hamilton that DNA tests proved that Hamilton had touched D.'s vagina with his penis and hand. Wells testified that he did so as "basically part of interrogation, just trying to find out the truth as to what happened, what he'd admit to doing."
¶17 In the interview Hamilton denied the allegations repeatedly. Wells repeatedly told Hamilton that his DNA evidence proved them true. Hamilton said all he had done was "hug [D.] and pat her on the butt[.]" Hamilton then said he had both patted her on the butt and "tapped her on her little stuff," which he explained was her vaginal area, adding that "[i]t was all in one motion though." He expressed regret and said that he "went stupid" at that moment. He said this occurred between noon and 1:00 p.m. when he passed D. on the stairs, and he said that both his mother and his brother were "right there" at the time.
The conviction and the postconviction motion.
¶18 The jury convicted Hamilton on both counts. Hamilton moved for postconviction relief. The postconviction court denied his motion without a hearing, and this appeal follows.
DISCUSSION
The standard of review and relevant law.
¶19 To overcome the presumption of constitutionally effective representation, a defendant must show both that counsel's performance was deficient and that this deficiency resulted in prejudice. Strickland , 466 U.S at 687. To prove deficient performance, the defendant must establish that counsel "made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." Id. Second, the defendant must show that the deficient performance prejudiced the defense, which "requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." Id. "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice ... that course should be followed." Id. at 697.
¶20 The sufficiency of a postconviction motion seeking an evidentiary hearing is a question of law that we review de novo . See State v. Balliette , 2011 WI 79, ¶18, 336 Wis. 2d 358, 805 N.W.2d 334. If the motion fails to allege sufficient facts or presents only conclusory allegations, it is insufficient to require a hearing. Id. Even if the motion is sufficient on its face, a court will not grant an evidentiary hearing if the totality of the record shows that the defendant is not entitled to relief. Id. , ¶50.
Hamilton has not shown that there is a reasonable probability that the alleged failures by trial counsel affected the trial's outcome.
¶21 We review the sufficiency of the postconviction motion to allege facts that would entitle Hamilton to an evidentiary hearing. See id. , ¶18. We start by examining whether Hamilton has shown that counsel's alleged failures prejudiced him. See Strickland , 466 U.S. at 697. Hamilton's postconviction motion argued that "counsel's failure to challenge the admissibility of the statement or, alternatively to present evidence at trial to minimize its impact, was prejudicial."
¶22 In the postconviction motion, Hamilton gives two reasons that "counsel's errors were so serious as to deprive [him] of a fair trial, a trial whose result is reliable." See id. at 687 (stating the showing necessary for a finding of prejudice).
¶23 First, he argues that the State's evidence was not strong, and "[t]he problem is that the confession went a long way toward eliminating any need for the jury" to sort out various alternative interpretations of D.'s testimony. Prejudice resulted because "[t]he credibility of the accusation was questionable, but the jury was left with no reason to question it given Mr. Hamilton's unchallenged and unexplained confession."[3] In support of this, Hamilton pointed to D.'s "unusual sexual knowledge" (based on the fact that she used the terms "pussy" and "dick"), her "unemotional" demeanor during the forensic interview, and the portions of her testimony in which she answered that she "forgot" what happened. He states that "the notion that Mr. Hamilton would commit these assaults ... in the living room with other people in the house" was "problematic[.]"
¶24 We cannot agree with Hamilton's assessment of the strength of the State's case. First, there was no delay in reporting the assault-D. told her mother within fifteen minutes of arriving at home after being at her grandmother's house. When the assault was reported to her, the child's mother immediately obtained a third party to hear the details, immediately contacted police, and immediately took the child for a sexual assault examination. Second, the testimony of the sexual assault nurse and the evidence of redness, tenderness, and abrasions she observed on the inner part of D.'s genitals constituted strong corroboration of D.'s accusation. The nurse testified that the abrasion was unusual, was consistent with fingernail injuries, and was not likely to have come from normal childhood play and activity. She testified that D. described having genital pain and that there was no evidence of any other source of pain and redness, such as infection or poor hygiene.[4] Third, the portions of D.'s trial testimony in which she stated that she "forgot" what happened did not contradict her previous accounts, and ultimately she testified consistently with the account she had told each adult after the assault. In fact, Hamilton does not even argue that any inconsistencies existed. Fourth, the jury saw the child's videotaped forensic examination and the child's testimony, during which she was subject to extensive cross-examination, and thus had ample opportunity to weigh her credibility. In sum, we conclude that the State's evidence against Hamilton was strong.
¶25 In an attempt to rebut the strength of the State's case, Hamilton makes only a conclusory argument that the child's use of sexual language is "unusual" and speculates that this means that she has discussed sex with someone. Hamilton's assessment of the child's "odd" manner in the forensic interview is an unsupported opinion.
¶26 Second, Hamilton claims that admission of what he calls the "confession" prejudiced the result. He argues that this alleged error affected the trial's outcome because when the statement was admitted without corresponding expert testimony, the jury "was left with the misimpression that an interrogation is a simple search for the truth" when in fact, he argues, the techniques employed with Hamilton are designed to manipulate a suspect into confessing and "create a particular risk of a false confession[.]" He therefore argues that counsel's failure to present testimony about police interrogation methods and their purpose meant the jury did not understand "how the detective's use of false DNA evidence [in the interrogation] to insist on [his] guilt could work to elicit an admission from an innocent person in general and from Mr. Hamilton in particular, given his vulnerabilities."[5] We understand him to be arguing that without expert testimony to undermine the jury's trust in police methods, the jury likely gave unwarranted weight to his statement admitting "patting" D.'s butt and "tapping" her vaginal area over her clothing.
¶27 We disagree with Hamilton. The jury was clearly presented with the police conduct during the interview and Hamilton's verbal and physical reactions. The jury saw the portions of the videotaped statement that both parties stipulated to admit as evidence and thus saw the context of Hamilton's statement to police. The detective who conducted the interview was vigorously cross-examined about the techniques, and he admitted lying to Hamilton. In closing argument, trial counsel emphasized that police had been coercive in obtaining Hamilton's statement. The jury was permitted to see the context in which Hamilton's statement occurred and thus additional expert testimony concerning what they observed directly-if it was even admissible-is not reasonably likely to have resulted in a different outcome.
¶28 Finally, Hamilton attempts to show prejudice by arguing that "the confession was the most damning piece of evidence" against him. We disagree. First of all, as stated above, the "most damning" evidence was the child's consistent testimony, immediate report, and the corroboration by witnesses and physical evidence, not Hamilton's very minimized description of innocent touching to the child's vaginal area while in the presence of other adults. Secondly, what the jury heard from Hamilton was not truly a "confession" because he explicitly denied the element of intent for sexual gratification. Rather, he admitted to non-criminal touching. Even if failure to move to exclude the statement was deficient performance, its content was too exculpatory to have substantially prejudiced Hamilton. He has failed to show that the statement's exclusion was reasonably probable to have led to a different result.
The real controversy was fully tried, and there is no basis for granting Hamilton a new trial in the interest of justice.
¶29 Hamilton argues that the real controversy was not fully tried[6] because the jury did not hear "expert testimony challenging the reliability of the confession[.]" We disagree with Hamilton that "the jury was persuaded to convict based [solely] on [his] admission[.]" The victim testified and was subject to cross-examination, as were each of the witnesses who corroborated her account. There is therefore no basis for granting a new trial in the interest of justice.
By the Court. -Judgment and order affirmed.
Not recommended for publication in the official reports.

The Honorable Ellen A. Brostrom presided over the jury trial and entered the judgment of conviction and the Honorable Mark A. Sanders issued the order denying the motion for postconviction relief.

See Miranda v. Arizona , 384 U.S. 436 (1966) (holding that a full warning of constitutional rights is "an absolute prerequisite" to interrogation; otherwise in-custody statements violate the Fifth Amendment privilege against self-incrimination and are therefore inadmissible).

The postconviction motion characterized Hamilton's statement as a "confession." We note that in his statement he did not admit to what D. said happened. This point of clarification, however, does not affect the legal analysis. For purposes of Fifth Amendment and due process protections, "[n]o distinction can be drawn between statements which are direct confessions and statements which amount to 'admissions' of part or all of an offense." Miranda , 384 U.S. at 476.

The postconviction motion's description of this case as "a child's accusation with no corroborating physical evidence" simply misstates the record.

The theory of defense in this case was "that Hamilton innocently patted his niece on the butt, not appreciating that she was probably too old for that, and that it would make her uncomfortable, which it did. She was angry, and felt violated, which brought to mind her sister's victimization [by a relative] and led to the accusation." He implies, though he does not say explicitly, that in response to interrogation pressure he falsely stated that he touched D. on her vaginal area over her clothes and "tapped" D. on "her little stuff." Hamilton's postconviction motion attached a defense expert's report that included an opinion based on Hamilton's scores on various psychological instruments, including two that measured his susceptibility and compliance. The report stated that Hamilton "evidences personality characteristics that render him highly suggestible in the presence of even mild interrogatory pressure ... and particularly likely to change his responses when even mildly pressured to do so." We do not address whether trial counsel performed deficiently by failing to challenge the admissibility of Hamilton's statement on voluntariness grounds because Hamilton's claim is analyzed under the rubric of ineffective assistance of counsel and because our analysis focuses on the prejudice prong.

Wisconsin Stat. § 752.35 (2015-16) permits reversal in the interest of justice:
In an appeal to the court of appeals, if it appears from the record that the real controversy has not been fully tried, or that it is probable that justice has for any reason miscarried, the court may reverse the judgment or order appealed from, regardless of whether the proper motion or objection appears in the record[.]